James C. Mitchell (SBN 87151)
Daniel M. Gilleon (SBN 195200)
The Gilleon Law Firm
1320 Columbia Street, Suite 200
San Diego, CA 92101
Tel: 619.702.8623/Fax: 619.702.6337
jcm@mglawyers.com
dmg@mglawyers.com
Attorneys for Plaintiffs Michelle Davis, Nicole Johnson and Claudia Ariza

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE DAVIS; NICOLE JOHNSON; CLAUDIA ARIZA,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF SAN DIEGO, a municipal corporation; CHRISTOPHER R. HAYS,<br><br>Defendants. | CASE NO. '14CV1488 DMS DHB<br><br>COMPLAINT FOR:<br>1. **Violation Of Civil Rights, 42 U.S.C. § 1983; and**<br>2. **Violation Of 42 U.S.C. § 3789d**<br><br>**Demand For Jury Trial** |

Plaintiffs Michelle Davis, Nicole Johnson and Claudia Ariza allege:

### GENERAL ALLEGATIONS

1.      Plaintiff Michelle Davis resides in San Diego County, California.

2.      Plaintiff Nicole Johnson resides in San Diego County, California.

3.      Plaintiff Claudia Ariza resides in San Diego County, California.

4.      Defendant City of San Diego (the "City") is a municipal corporation within California.

5.      At all material times, defendant Christopher R. Hays resided in San Diego, California and was employed as a police officer by the City with San Diego Police Department ("SDPD").

///

6.      At all material times, Hays was employed as a police officer by the City and in doing the acts alleged in this complaint was acting within the course and scope of his employment as a police officer with the City.

7.      Jurisdiction is proper in this Court per 28 U.S.C. 1331, a Federal question.

8.      Venue is proper in this district per 28 U.S.C. 1391(b)(1) because the defendants reside in this district and the occurrences or omissions that plaintiffs' claims arise from happened in this district.

9.      Part of the events that led to plaintiffs' claims began, at the latest, in 1994 when one Anthony Arevalos graduated from the San Diego Police Academy and immediately became employed as a police officer with SDPD and the City. The City, the SDPD and SDPD's supervisory officials, failed to properly test, screen, examine, evaluate or train Arevalos before hiring him as a police officer. As a result, the City, SDPD and SDPD supervisory officials failed to properly identify Arevalos for what he was — a dangerous sexual predator.  Had the SDPD, the City and SDPD supervisory officials properly tested, screened, examined, evaluated and trained Arevalos, he never would have been hired as a police officer.

10.      Upon information and belief, SDPD's supervisory officials and the City had knowledge of the following as of September 2009:

          a.      In the 1999, when Arevalos was working general patrol in the SDPD's South Bay Division, he took into custody a nude and mentally deranged young woman as a Health & Welfare Code § 5150 detainee and then taunted and encouraged the woman to sexually penetrate herself vaginally with his department-issued baton/night stick while he watched and took Polaroid photographs of her doing this;

          b.      A complaint by a woman that, during a traffic stop of her by Arevalos in April or May 2001, that Arevalos, during an unlawful search of the woman, groped the woman's breast and sexually assaulted her;

1          c.     Around July 2007, Arevalos pulled over a 16-year old female driver

2 during a routine traffic stop and forced her to bend over outside of her vehicle to show

3 him her current registration tabs on the license plate — all for the purpose of Arevalos

4 "checking out" or ogling the young woman's butt;

5          d.     That Arevalos, after being assigned to the SDPD traffic division

6 and its special driving under the influence, or "DUI" enforcement unit, regularly and

7 unnecessarily targeted for investigation and arrest for DUI primarily young women

8 under 35 years of age to the extent that other police officers derisively referred to

9 Arevalos as the "Las Colinas Transport Unit;"

10          e.     Arevalos routinely had large amounts of unaccounted for or

11 "missing" time during his shifts, in particular, during stops of female motorists, that

12 were never adequately explained in his written reports or shift diaries;

13          f.     Arevalos, using the camera on his cellular phone, surreptitiously

14 took photographs of young women in the Gaslamp Quarter in downtown San Diego

15 and forwarded the photographs to other police officers, including to his supervisor,

16 Sergeant Kevin Friedman;

17          g.     Among the photographs Arevalos took and shared with fellow

18 police officers and supervisors were photographs of him being orally copulated and

19 engaging in sexual intercourse in uniform all in the back of a SDPD patrol car, some

20 of which he kept in an album at the police station;

21          h.     Arevalos bragged when showing these photographs to other police

22 officers and his supervisors that he was the uniformed officer in the photographs;

23          i.     In September 2009, rather than arresting a woman Arevalos had

24 detained for driving while under the influence or DUI, he solicited a bribe of a sexual

25 favor from her in return for releasing her, a felony under Penal Code § 68, and then

26 sexually assaulted her anyway; and

27          j.     Other information about citizens' or other police officers'

28 complaints about Arevalos' misconduct, conduct unbecoming a police officer or

1    conduct that violated SDPD procedures or standard police procedures for handling
2    traffic stops or performing physical searches of suspects, in particular, women.

3        11.    The 1999 incident with Arevalos and the mentally deranged woman
4    described in paragraph 10.a. above was interrupted by another police officer who
5    reported the incident. Arevalos physically threatened the officer warning him to never
6    again interrupt him. Nevertheless, the police officer, who is now retired, reported the
7    incident to his and Arevalos' supervisors, Sergeant Danny Hollister and Sergeant (now
8    Lieutenant, and head of the powerful SDPD Criminal Intelligence Unit) Rudy Tai. Tai
9    passed the information on to his supervisor, Lieutenant Jorge Guevara.  Neither
10   Hollister, Tai nor Guevara did anything to report the incident involving Arevalos and
11   the deranged young woman up the SDPD chain of command, or to other SDPD
12   supervisory officials charged with investigating officer misconduct. Rather, along with
13   Arevalos, they destroyed the Polaroid photographs taken by Arevalos and other
14   evidence of the incident.  Tai also gave Arevalos a verbal reprimand, something Tai
15   knew would not appear on Arevalos' personnel record and could mislead police
16   officials that Arevalos had never been involved in suspected misconduct toward
17   citizens.  In addition, Guevara, Tai and Hollister, with the support of other police
18   officers and other SDPD supervisory officials, carried out a campaign of abuse,
19   intimidation and harassment against the police officer who reported the incident to
20   punish him for making the complaint against a fellow officer, Arevalos. This included
21   initiating improper conduct with that police officer's minor daughter.

22       12.    This 1999 cover up of Arevalos' criminal misconduct and cover up of
23   later misconduct by him and other officers was done as part of a long-standing
24   unwritten SDPD policy that encouraged a two-tiered system of justice — one a system
25   of unwritten privileges and immunities that applied to SDPD police officers and other
26   members of the "law enforcement community" and another system of codified laws
27   and regulations that applied to the ordinary citizens. This SDPD "unwritten policy"
28   included not ticketing SDPD police officers stopped for Vehicle Code violations,

including DUI, and also "fixing tickets" for SDPD police officers, as well as other law enforcement officers and officials. This "unwritten policy" also manifested itself with SDPD police officers and SDPD supervisory officials discouraging fellow police officers from reporting instances of suspected police officer misconduct to their supervisors, or SDPD Internal Affairs ("IA") the division of the department charged with investigating police officer misconduct. The policy further included SDPD police officers and supervisory officials covering up reports of officer misconduct. This policy has continued through the present time.

13. The April or May 2001 incident described in paragraph 10.b. above was reported by the victim to Arevalos' supervisors at SDPD, as well as to other SDPD supervisory officials. The then SDPD police chief, David Bejarano, learned of the report and the incident. He met with the victim twice and she described to him the details of the traffic stop and sexual assault by Arevalos. Chief Bejarano told the victim Arevalos had already been properly disciplined and would never again be allowed to do what he did to her or any other citizen. This was a complete misrepresentation as Arevalos was never punished or disciplined for that 2001 incident.

14. The minor involved in the July 2007 traffic stop descried in paragraph 10.c., her father and a family friend who was a SDPD sergeant reported the incident to Arevalos' supervisors, Sergeant Matt Verduzco and Lieutenant Victoria Binkerd. The documentation on the report was destroyed, the matter was not investigated and the family friend was rebuked by fellow officers and SDPD supervisory officials for "siding with a civilian" against a fellow officer, Arevalos.

15. The victim of the September 2009 incident described in paragraph 10.i. reported the incident to an SDPD detective who, because of the "unwritten policy" described in paragraph 12, failed to report the incident to his superiors or other SDPD supervisory officials to IA.

16. SDPD supervisory officials and the City also had knowledge of a

February 2010 complaint by a woman who was arrested for DUI by Arevalos in January 2010. She notified SDPD that Arevalos had either assaulted or sexually assaulted her in the back seat of his police car while he was transporting her to the Las Colinas Women's Facility. SDPD supervisory officials and the City believed this was a crime committed by Arevalos and recommended prosecuting him for these crimes to the Office of the District Attorney, San Diego County. However, SDPD supervisory officials, along with Sergeant Friedman, Arevalos' supervisor, and other police officers, impaired the effective exercise of prosecutorial discretion to prosecute Arevalos by falsely impugning the victim's credibility and otherwise attempting to unfairly influence members of the District Attorney's office to not prosecute Arevalos. After the District Attorney declined to prosecute Arevalos, SDPD supervisory officials, in particular, Assistant Chief Robert Kanaski, returned Arevalos to his previous duties with the traffic division without imposing any reasonable disciplinary actions upon him.

17.     From 2003 to the present, SDPD, its supervisory officials and the City instituted a procedure for investigating citizens' complaints of police officer misconduct that was inadequate and designed to not impartially investigate such complaints. Such policy or policies relegated citizens' complaints to the SDPD of officer misconduct to second-class status where such complaints were either not investigated at all, or received less than an impartial investigation by SDPD and its supervisory officials.

18.     The City, the SDPD and its supervisory officials had policies that have continued through to the present of:

    a.     Failing and refusing to establish or enforce administrative procedures and training to ensure safety of detainees or arrestees;

    b.     Failing and refusing to adequately discipline police officers, like Arevalos and others, for acts of abuse and misconduct, conduct that violated SDPD department procedures or conduct unbecoming a police officer;

c.     Failing and refusing to impartially investigate citizen's complaints of alleged abuse or misconduct by police officers;

d.     Reprimanded, threatened, intimidated and demoted police officers who reported acts of misconduct or abuse by other officers;

e.     Covering up acts of police officer misconduct or sanctioned a code of silence by police officers commonly referred to as the "Blue Wall," which resulted in complaints of police officer misconduct not being investigated or not being adequately and impartially investigated;

f.     Failing and refusing to adequately supervise the actions of police officers under their control and guidance;

g.     Intentionally mischaracterizing and improperly identifying complaints against Arevalos and other police officers of suspected police misconduct against citizens as low-level "Public Service Inquiries" in an attempt to dissuade victims of suspected misconduct, other police officers and witnesses from telling their stories of suspected officer misconduct and, also, to avoid having to report such complaints to the Citizen's Review Board On Police Misconduct, IA or the City's Mayor's office, or others, and through this, to prevent complete, objective and factual investigations of such complaints and avoid possible bad publicity in the media about the SDPD and its police officers, in particular, the chief of police, and the SDPD upper chain of command;

i.     Allowing the "unwritten policy" described in paragraph 12 to exist; and

j.     Failing to have in place a specific written department policy that mandated all police officers who either witnessed, or who received verbal reports of on-the-job police officer misconduct to report such alleged misconduct to SDPD supervisory officials, including, but not limited to, IA.

19.     In addition and upon information and belief, SDPD, its supervisory officials and the City knowingly sanctioned or allowed a pattern of conduct by male

1  police officers, including traffic division officers, that consisted of patrolling the

2  Gaslamp Quarter Downtown San Diego, and certain beach community areas, that

3  consisted of a party-type atmosphere where male police officers, including

4  supervisors, such as, for example, Sergeant Friedman, were attempting to get dates

5  with or pick up women while on duty.

6       20.    SDPD, its supervisory officials and the City from at least 1999 to the

7  present:

8           a.    Knowingly, with gross negligence and with deliberate indifference

9  of the constitutional rights of citizens, maintained and permitted an official policy and

10  custom of permitting the occurrence of the types of wrongs alleged in this complaint;

11           b.    Maintained, fostered, condoned or else failed to correct wrongful

12  conduct and, through this, created an official policy practice or custom of permitting

13  the occurrence of the types of wrongs alleged in this complaint;

14           c.    Maintained, fostered or condoned policies and customs, including

15  but not limited to, deliberate indifferent training of its police officers about what

16  constituted unreasonable searches or seizures of citizens;

17           d.    Maintained, fostered or condoned policies and customs that

18  included the express and/or tacit encouragement to its police officers to ignore

19  unlawful conduct and/or to ratify police misconduct by officers failing to intercede

20  when unlawful conduct was underway and/or by making material omissions in police

21  reports to prevent detection of unlawful conduct; and

22           e.    Maintained, fostered, condoned or failed to conduct adequate

23  investigations of police misconduct to prevent future misconduct from occurring.

24       21.    In or around 2003, the SDPD chief, then William Landsdowne, other

25  SDPD supervisory officials and the City disbanded the SDPD's 20-year old anti-

26  corruption unit, the "Professional Standards Unit," or PSU. The PSU had, as its

27  official charge, the responsibility of actively and aggressively investigating, uncovering

28  and prosecuting police misconduct, including misconduct that was subject to

1  complaints by members of the public allegedly victimized by police officers charged

2  with protecting and serving citizens of San Diego.  The elimination of the PSU, this

3  specialized unit, was a signal and affirmation to the SDPD, its police officers and its

4  supervisory officials that those police officers who chose to exploit their positions of

5  power, authority and trust by victimizing members of the very community they had

6  sworn to protect would not be investigated, prosecuted, pursued or punished for their

7  actions.  The message was that such suspected victimization and police misconduct

8  would be tolerated, protected, covered up and/or ignored.   In addition, Chief

9  Landsdowne instituted a process, manner and method by which complaints against

10 police officers were handled that significantly altered and, in fact, prevented members

11 of the public from lodging complaints against police officers directly with the IA.

12 Chief Landsdowne instituted a policy that denied the public access to IA and required

13 citizens to lodge complaints of suspected police officer misconduct with low-level

14 desk officers at local stations who were not trained to handle such citizen complaints.

15 This policy change was motivated by the SDPD, the City and the SDPD supervisory

16 officials' desire to deter, avoid and prevent full reporting and investigation of officer-

17 related misconduct through intimidation, harassment, embarrassment, frustration and

18 obstruction of the public means of seeking redress for such police officer related

19 misconduct, in reality, the "unwritten policy" described in paragraph 12.

20       22.     The SDPD police officer, Hays, who committed the wrongful acts against

21 plaintiffs Davis, Johnson, Ariza and others, as alleged in this complaint, attended the

22 police academy in 2009 and 2010 and was hired as a police officer with the SDPD and

23 the City in late 2009 or early 2010.  He was then aged 26 and was the son-in-law of

24 then SDPD Captain and now Assistant Chief, Mark Jones, a veteran officer of some

25 30 years, who now heads SDPD's Special Operations Unit

26       23.     The SDPD training sergeant at the academy when Hays attended it was

27 one Sandra Rapalee (who is now a Lieutenant and head of the SDPD Training Unit).

28 Hays' field training officer, Mark Lopez, recommended to Rapalee and other SDPD

supervisory officials at the academy that Hays' performance at the academy was well-below average, he was unfit to be a SDPD police officer and he should be "washed out" and not hired as a police officer. On information and belief, Jones, who in 2009 and 2010 was not assigned to the academy or involved with police officer candidates' training or evaluations, violated SDPD policy and wrongfully interfered with and influenced the potential decision by Rapalee, or other training officers at the academy to wash his son-in-law, Hays, out. On information and belief, Jones interceded with Rapalee asking her to return a favor he did for her and not wash Hays out of the academy. On information and belief, Rapalee did this and rejected the recommendation of Hays' training officer, Lopez, to wash Hays out of the academy. As a result, Hays, who was unfit to be a police officer and should not have been hired as a police officer was hired as an officer by SDPD.

24.    The City, SDPD and SDPD supervisory officials, failed to properly test, screen, examine, evaluate or train Hays before hiring him as a police officer. As a result, the City, SDPD and SDPD supervisory officials failed to properly identify Hays as a person who was unfit to be a police officer. Had the City, SDPD and SDPD supervisory officials properly tested, screened, examined, evaluated and trained Hays, he would never have been hired as a police officer.

25.    In March 2011, after a report by one Jane Doe to the SDPD and the City that Arevalos had sexually assaulted her during a DUI traffic stop on March 9, 2011, Arevalos was fired from his job as a police officer and charged by the District Attorney with crimes committed against the Jane Doe and various other victims, *People of the State of California v. Anthony Arevalos*, San Diego Superior Court Case No. SCD233024. On November 17, 2011, Arevalos was convicted of the following crimes:

a.    Jane Doe, sexual battery, Penal Code § 243.4(a), soliciting a bribe, Penal Code § 68, assault and battery, Penal Code § 149 and misdemeanor false imprisonment, Penal Code §§ 236, 237(a);

1        b.     Jeannie E., soliciting a bribe, Penal Code § 68, misdemeanor false

2   imprisonment, Penal Code §§ 236, 237(a);

3        c.     Melissa Wilde, soliciting a bribe, Penal Code § 68, assault and

4   battery, Penal Code § 149 and misdemeanor false imprisonment, Penal Code §§ 236,

5   237(a);

6        d.     Melissa Marin., soliciting a bribe, Penal Code § 68, misdemeanor

7   false imprisonment, Penal Code §§ 236, 237(a); and

8        e.     Melissa R., soliciting a bribe, Penal Code § 68.

9      26.   The SDPD's and District Attorney's investigation of Arevalos instigated

10  by the Jane Doe incident revealed numerous other incidents of criminal misconduct by

11  Arevalos consisting of false imprisonment, false arrest, assault and battery, sexual

12  assault and battery and soliciting bribes from young women he allegedly pulled over

13  for Vehicle Code/traffic violations between 2009 and March 2011.  The additional

14  victims included Mary Bracewell, Dani Fisher, Talia Tortora, Lacy White, Marjan

15  Montazemi and Emma M., as well as at least five other victims.

16      27.   In 2011, then SDPD Chief, Landsdowne, promised the public that the

17  City, SDPD and SDPD supervisory officials would review and revise all policies for

18  identifying, reporting, documenting and investigating police officer misconduct, either

19  misconduct reported by a citizen, or witnessed by other police officers, as well as

20  review and revise the procedures for disciplining police officers proved to have

21  engaged in misconduct. The City, SDPD and SDPD supervisory officials failed to do

22  this and, instead, allowed the situation and circumstances described in paragraphs 10

23  through 21 to continued unchanged and unabated.

24      28.   In 2011, then Chief Landsdowne also promised the public that the City,

25  SDPD and SDPD supervisory officials would do a top to bottom investigation and

26  review and institute the necessary changes in departmental policies so that SDPD

27  police officers, as well their supervisors, were properly trained and supervised to

28  insure that incidents of suspected police misconduct were identified, reported,

documented and investigated.  This promise of creating and implementing new SDPD policies, rules and procedures to create a "standard of excellence" were not done by the City, SDPD and SDPD supervisory officials.   Again, the situation and circumstances described in paragraphs 10 through 21 were allowed to continue unchanged.

29.   Landsdowne also promised the public in 2011 that the City, SDPD and SDPD supervisory officials would institute a written department-wide policy and procedure that mandated all police officers who either witnessed or who received verbal reports by the public of suspected police officer misconduct to report the alleged misconduct to SDPD supervisory officials or to IA.  The City, SDPD and SDPD supervisory officials failed to institute such a policy until April 29, 2014.

30.   In 2011, then Chief Landsdowne also promised the public that the City, SDPD and SDPD supervisory officials would investigate the earlier reports and incidents of Arevalos' misconduct, as alleged in paragraphs 10 and 16, to determine if other police officers were involved in the misconduct, or if police officers and SDPD supervisory officials had handled the incidents and complaints properly. Despite this promise, the City, SDPD and SDPD supervisory officials never ordered or conducted any such investigation.

31.   As a result of the facts alleged in paragraphs 10 through 30, misconduct against citizens by police officers, like Hays, as alleged below, was allowed to and did continue.

32.   Hays, as it turned out, was more of a sexual predator, who abused his power and authority as a SDPD police officer to either illegally and forcibly solicit and/or to obtain sexual favors from women he dealt with during the course of performing his duties as a police officer, than Arevalos.  The City, SDPD and its supervisory officials learned in January or February 2014 about the following suspected criminal misconduct by Hays while he was performing his duties as a police officer on these eight victims and possibly others:

a.      Davis, false imprisonment, sexual assault and battery, indecent exposure, forcible oral copulation, soliciting a bribe, early October, 2012;

b.      Johnson, false imprisonment, approximately August 9, 2012;

c.      Ariza, sexual assault and battery, indecent exposure, false imprisonment, June 12, 2013;

d.      Jakema R., false imprisonment, sexual assault and battery, October 30, 2013;

e.      Melanie W., false imprisonment, sexual assault and battery, December 23, 2013;

f.      Amber P., false imprisonment, sexual assault and battery, December 23, 2013;

h.      Jane Doe 4, false imprisonment, December 24, 2013; and

g.      Jane Doe 7, false imprisonment, sexual assault and battery, October 2013.

33.    On February 9, 2014, the SDPD arrested Hays charging him with felonies and misdemeanors involving his alleged crimes committed against Jakema R., Melanie W., Amber P. and Jane Doe 4.  On February 18, 2014, the District Attorney filed a criminal complaint against Hays, ***People v. Hays***, San Diego Superior Court Criminal Case No. SCD253998, charging Hays with felonies and misdemeanors for alleged crimes committed against Jakema R., Melanie W., Amber P. and Jane Doe 4.  Hays resigned as a police officer from SDPD and the City on February 19, 2014.  Hays is currently free on $130,000 bond awaiting trial.

**FIRST CAUSE OF ACTION**
**(Violation Of Civil Rights, 42 U.S.C. § 1983, By Plaintiff Michelle Davis Against Defendants City of San Diego, Christopher R. Hays)**

34.    Davis realleges paragraphs 1 through 33.

35.    In early October 2013, on a Friday or weekend night around 1:00 to 2:00 a.m., Davis was a passenger in her cousin Frederick Sparrow's car.  They had been with friends at a sports bar and Davis had been drinking alcoholic beverages.  Sparrow

1  was driving west on El Cajon Boulevard near the 7200-7300 block to take Davis to her
2  home that was several blocks south at 4650 Harbinson Avenue, La Mesa.  The car
3  stalled out in the middle of El Cajon Boulevard near the center median.  Sparrow left
4  Davis in the passenger seat of the car and walked in the direction of 70th Street to get
5  help.

6      36.    Shortly after the car stalled, Hays, who was in uniform, on duty and on
7  patrol in an SDPD police cruiser at the time, arrived on the scene and parked his
8  vehicle behind Sparrow's car.  He approached Davis, who was still sitting in the car,
9  and asked her what happened.  She told him the car had stalled and Sparrow had left
10  to get help.  Hays asked her if she had been drinking and if she had been driving, not
11  necessarily in that order.  She told him she had been drinking, but had not been
12  driving.  They waited about 10 to 15 minutes for Sparrow to return.  When he did not,
13  Hays told Davis he would have to call a tow truck and have the car towed because it
14  was a traffic hazard.  He did call the tow truck and after it had arrived and left with
15  Sparrows' car, Hays offered to drive Davis to her home on Harbinson Avenue.  She
16  agreed.

17      37.    Hays then drove Davis to her home on Harbinson Avenue in the SDPD
18  police cruiser.  Davis was sitting in the front seat with him.  When they arrived at
19  Davis' home, he parked the car and told Davis before she got out that he could still
20  arrest her and take her to jail for DUI because, he said, "You were probably driving,"
21  but if you "go down on me" I will let you out.  Davis was in fear of being arrested and
22  jailed, or of Hays doing something to injure her, so she agreed and then orally
23  copulated him to completion in the front seat of his patrol car.  Davis then got out of
24  the car and went inside her home.

25      38.    Through the conduct of the City and Hays, Davis was deprived of rights,
26  privileges and immunities secured to her by the Fourth and Fourteenth Amendments
27  of the Constitution of the United States, and similar provisions of the California
28  Constitution by her unreasonable seizure and detention, and unlawful intrusion into and

1 violation of her body and by such defendants engaging in conduct that abused their

2 power and authority as a police officer to the extent that shocks the conscience.

3    39.   Davis was harmed by the City and Hays' conduct that was a substantial

4 factor that caused her to suffer severe emotional distress, shame, humiliation, fear,

5 shock, extreme nervousness, disgust, as well as physical injury, that has damaged her

6 in an amount that exceeds $25,000.

7    40.   Hays acted with malice or oppression as defined in California Civil Code

8 § 3294, which entitles Davis to recover punitive damages against Hays.

9    41.   Davis has incurred and will incur attorneys' fees in prosecuting this claim

10 against the City and Hays, which fees are recoverable from such defendants under 42

11 U.S.C. § 1988.

12                    **SECOND CAUSE OF ACTION**
   **(Violation Of Civil Rights, 42 U.S.C. § 1983, By Plaintiff Michelle Davis**
13       **Against Defendants City of San Diego, Christopher R. Hays)**

14    42.   Davis realleges paragraphs 1 through 37.

15    43.   Davis has constitutional interests and rights under the Fourth and

16 Fourteenth Amendments to the U.S. Constitution and similar provisions of the

17 California Constitution to be free from an unreasonable seizure or detention of her

18 person, sexual harassment or violation of her person during such detention and arrest,

19 as well as the right to not have her body violated by a law enforcement officer.

20    44.   The acts of Hays and the City as alleged above, constituted a deprivation

21 of or a violation of Davis' constitutional rights under the U.S. and California

22 Constitutions.

23    45.   Davis realleges paragraphs 39 through 41.

24                    **THIRD CAUSE OF ACTION**
   **(Violation Of Civil Rights, 42 U.S.C. § 1983, By Plaintiff Claudia Ariza**
25       **Against Defendants City of San Diego, Christopher R. Hays)**

26    46.   Ariza realleges paragraphs 1 through 33.

27    47.   On June 12, 2013, Ariza was residing at 3735 College Avenue, San Diego,

28 with one Daniel Gerken. On that date in the late morning, she called 911 for the SDPD

1    to respond and protect her from domestic violence by Gerken.  One of the on-duty,

2    uniformed SDPD officers who responded to this call was Hays.  The police officers

3    discovered Gerken hiding on the roof of the residence and arrested him.

4          48.    After the arrest and the other SDPD officers had left with Gerken, Hays

5    remained behind inside Ariza's residence.  He cornered her in a room in the house,

6    stared at her breasts, smiled at her and then approached and physically hugged her

7    tightly pulling her breasts hard against him.  Hays then backed away, unzipped his

8    pants and pulled out his then erect penis and testicles and masturbated in front of

9    Ariza.

10          49.    Ariza had noticed Hays' wedding ring and asked if he was married and

11   asked how he could do such a thing to his wife.  Hays became enraged, put his penis

12   and testicles back in his pants and began to leave.  Ariza asked if he would be coming

13   back and he angrily said yes.

14          50.    Over the next weeks and on at least two occasions through August 2013,

15   an SDPD police car drove by Ariza's house and shined a search light at the house as

16   the car drove past.

17          51.    Through the conduct of the City and Hays, Ariza was deprived of rights,

18   privileges and immunities secured to her by the Fourth and Fourteenth Amendments

19   of the Constitution of the United States, and similar provisions of the California

20   Constitution by her unreasonable seizure and detention, and unlawful intrusion into and

21   violation of her body and by such defendants engaging in conduct that abused their

22   power and authority as a police officer to the extent that shocks the conscience.

23          52.    Ariza was harmed by the City and Hays' conduct that was a substantial

24   factor that caused her to suffer severe emotional distress, anxiety, panic attacks,

25   depression, shame, humiliation, fear, shock, extreme nervousness, disgust, as well as

26   physical injury, that has damaged her in an amount that exceeds $25,000.  Ariza has

27   also incurred expenses from healthcare providers for treatment for such physical and

28   psychological injuries.

1    53.    Hays acted with malice or oppression as defined in California Civil Code

2    § 3294, which entitles Ariza to recover punitive damages against Hays.

3    54.    Ariza has incurred and will incur attorneys' fees in prosecuting this claim

4    against the City and Hays, which fees are recoverable from such defendants under 42

5    U.S.C. § 1988.

6    **FOURTH CAUSE OF ACTION**
     **(Violation Of Civil Rights, 42 U.S.C. § 1983, By Plaintiff Claudia Ariza**
7    **Against Defendants City of San Diego, Christopher R. Hays)**

8    55.    Ariza realleges paragraphs 1 through 33, and 47 through 50.

9    56.    Ariza has constitutional interests and rights under the Fourth and

10   Fourteenth Amendments to the U.S. Constitution and similar provisions of the

11   California Constitution to be free from an unreasonable seizure or detention of her

12   person, sexual harassment or violation of her person during such detention and arrest,

13   as well as the right to not have her body violated by a law enforcement officer.

14   57.    The acts of Hays and the City, as alleged above, constituted a deprivation

15   of or a violation of Ariza's constitutional rights under the U.S. and California

16   Constitutions.

17   58.    Ariza realleges paragraphs 52 through 54.

18   **FIFTH CAUSE OF ACTION**
     **(Violation Of Civil Rights, 42 U.S.C. § 1983, By Plaintiff Nicole Johnson**
19   **Against Defendants City of San Diego, Christopher R. Hays)**

20   59.    Johnson realleges paragraphs 1 through 33.

21   60.    Around August 9, 2012 at about 11:00 a.m., Johnson was driving her car

22   on 58th Street south of El Cajon Boulevard, San Diego.  Hays was on duty as an

23   SDPD police officer, in uniform and patrolling this area in his police cruiser.  Using the

24   lights on the police cruiser, Hays stopped Johnson for an equipment infraction on her

25   car — driving with a malfunctioning rear brake light.  During the approximate 20 to

26   25 minute traffic stop, Hays engaged in a personal conversation with Johnson and

27   asked her unnecessary and unwanted personal questions, was she married, was her

28   husband home and did she have children.  He then told Johnson to get out of her car

1   because there was a warrant for her arrest.  Johnson refused. She told Hays there
2   could not possibly be a warrant for her arrest and that she would not get out of her car
3   until he explained to her what the warrant was for. He never did. Instead, Hays told her
4   he was just joking and was only trying to get her out of the car. Johnson told him to
5   either give her a ticket, or let her go.  Hays continued with the unnecessary and
6   unwanted personal conversation with Johnson, telling her things that were unrelated to
7   the traffic stop, that he was getting divorced or was separated from his wife, he was
8   lonely and he would come to her house and fix the taillight if her husband was not
9   home. Hays also asked to go out to dinner with him. Johnson said no and again asked
10   him to either ticket her or let her go. He let her go, but followed her for some time after
11   she drove away.

12        61.   Through the conduct of the City and Hays, Johnson was deprived of
13   rights, privileges and immunities secured to her by the Fourth and Fourteenth
14   Amendments to the U.S. Constitution and provisions of the California Constitution by
15   her unreasonable seizure and detention and engaging in conduct that abused Hays'
16   power and authority as a police officer to the extent that it shocks the conscience.

17        62.   As a legal result of the acts of the City and Hays, Johnson sustained
18   severe emotional distress consisting of fear, humiliation, shock and extreme
19   nervousness that has damaged her in an amount that exceeds $25,000.

20        63.   Hays acted with malice or oppression as defined in California Civil Code
21   § 3294, which entitles Johnson to recover punitive damages against him.

22        64.   Johnson has incurred and will incur attorneys' fees prosecuting this claim
23   against the City and Hays, which fees are recoverable from such defendants under 42
24   U.S.C. § 1988.

25   **SIXTH CAUSE OF ACTION**
   **(Violation Of Civil Rights, 42 U.S.C. § 1983, By Plaintiff Nicole Johnson**
26   **Against Defendants City of San Diego, Christopher R. Hays)**

27        65.   Johnson realleges paragraphs 1 through 33 and 60.

28        66.   Johnson has constitutional interests and rights under the Fourth and

1  Fourteenth Amendments to the U.S. Constitution and provisions of the California

2  Constitution to be free from an unreasonable seizure or detention of their person and

3  sexual harassment during such detention and potential arrest.

4      67.    The acts of the City and Hays constituted a deprivation or violation of

5  Johnson's constitutional rights.

6      68.    Johnson realleges paragraphs 62 through 64.

7                    **SEVENTH CAUSE OF ACTION**
   **(Violation Of Civil Rights, 42 U.S.C. § 3789d, By All Plaintiffs**

8                **Against Defendant City of San Diego)**

9      69.    Plaintiffs reallege paragraphs 1 through 68.

10     70.    The City and SDPD have been the recipients of assistance and funding

11  from the federal government under the Omnibus Crime Control and Safe Streets Act

12  of 1968, 42 U.S.C. § 3799d.

13     71.    The City, SDPD and SDPD supervisory officials by engaging in the

14  discriminatory acts in connection with programs and/or activities funded in whole or

15  in part with funds provided to the City and SDPD under 42 U.S.C. § 3789d, as alleged

16  in this complaint, violated and are in violation of the specific provisions of 42 U.S.C.

17  § 3789d, that prohibits such discrimination.  Plaintiffs, therefore, request a finding

18  under 42 U.S.C. § 3789d(e)(2)(A) that the City and SDPD has engaged in a pattern or

19  practice of discrimination that has violated 42 U.S.C. § 3789d(e)(1).

20                            **JURY DEMAND**

21     72.    Plaintiffs demand a jury trial.

22                        **REQUEST FOR RELIEF**

23  Therefore, plaintiffs Michelle Davis, Nicole Johnson and Claudia Ariza request

24  a judgment against defendants City of San Diego and Christopher R. Hays for:

25     a.    General damages according to proof;

26     b.    Special damages according to proof;

27     c.    Punitive damages against Hays;

28     d.    A finding that the City has engaged in a pattern or practice of

1  discrimination that violates 42 U.S.C. § 3789d(e)(1);

2          e.      Reasonable attorneys' fees under 42 U.S.C. § 1988e;

3          f.      Costs of suit; and

4          g.      Any other proper relief.

5

6  Date: June 18, 2014                    The Gilleon Law Firm

7                                                /s/ James C. Mitchell
                                          James C. Mitchell, Attorneys for
8                                         Plaintiffs Michelle Davis, Nicole Johnson
                                          and Claudia Ariza
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
MICHELLE DAVIS; NICOLE JOHNSON; CLAUDIA ARIZA

## DEFENDANTS
CITY OF SAN DIEGO, a municipal corporation;
CHRISTOPHER HAYS

**(b)** County of Residence of First Listed Plaintiff  SAN DIEGO
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  SAN DIEGO
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
JAMES C. MITCHELL(SBN 87151);DANIEL M. GILLEON (SBN 195200)
THE GILLEON LAW FIRM
1320 COLUMBIA ST., STE. 200, SAN DIEGO, CA 92101; 619.702.8623

Attorneys *(If Known)*
JAN GOLDSMITH, CITY ATTORNEY
CITY OF SAN DIEGO
1200 THIRD AVE., STE. 1200,SAN DIEGO, CA 92101; 619.236.8486

**'14CV1488 DMS DHB**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### CIVIL RIGHTS
- ☒ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983, 42 U.S.C. § 3789d
Brief description of cause:
VIOLATION OF CIVIL RIGHTS

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $  75,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE  06/18/2014
SIGNATURE OF ATTORNEY OF RECORD  /s/ James C. Mitchell

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____