1  James C. Mitchell (SBN 87151)
2  Daniel M. Gilleon (SBN 195200)
   The Gilleon Law Firm
   1320 Columbia Street, Suite 200
3  San Diego, CA 92101
   Tel: 619.702.8623/Fax: 619.702.6337
4  jcm@mglawyers.com
   dmg@mglawyers.com
5  Attorneys for Plaintiffs Michelle Davis, Nicole Johnson and Claudia Ariza

6

7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

| 11  MICHELLE DAVIS; NICOLE JOHNSON; CLAUDIA ARIZA, | **CASE NO. 14-cv-1488 DMS-DHB** |
|---|---|
| 12                          Plaintiffs, | **FIRST AMENDED COMPLAINT FOR:** |
| 13       vs. | 1.  **Violation Of Civil Rights, 42 U.S.C. § 1983; and** |
| 14  CITY OF SAN DIEGO, a | 2.  **Violation Of 42 U.S.C. § 3789d** |
| 15  municipal corporation; CHRISTOPHER R. HAYS, | (Demand For Jury Trial) |
| 16                          Defendants. | |
| 17 | |

18       Plaintiffs Michelle Davis, Nicole Johnson and Claudia Ariza allege:

19                    **GENERAL ALLEGATIONS**

20       1.    Plaintiff Michelle Davis resides in San Diego County, California.

21       2.    Plaintiff Nicole Johnson resides in San Diego County, California.

22       3.    Plaintiff Claudia Ariza resides in San Diego County, California.

23       4.    Defendant City of San Diego (the "City") is a municipal corporation

24  within California.

25       5.    At all material times, defendant Christopher R. Hays resided in San

26  Diego, California and was employed as a police officer by the City with San Diego

27  Police Department ("SDPD").

28  / / /

6.     At all material times, Hays was employed as a police officer by the City and in doing the acts alleged in this complaint was acting within the course and scope of his employment as a police officer with the City.

7.     Jurisdiction is proper in this Court per 28 U.S.C. 1331, a Federal question.

8.     Venue is proper in this district per 28 U.S.C. 1391(b)(1) because the defendants reside in this district and the occurrences or omissions that plaintiffs' claims arise from happened in this district.

9.     Part of the events that led to plaintiffs' claims began, at the latest, in 1994 when one Anthony Arevalos graduated from the San Diego Police Academy and immediately became employed as a police officer with SDPD and the City. The City, the SDPD and SDPD's supervisory officials, failed to properly test, screen, examine, evaluate or train Arevalos before hiring him as a police officer. As a result, the City, SDPD and SDPD supervisory officials failed to properly identify Arevalos for what he was — a dangerous sexual predator. Had the SDPD, the City and SDPD supervisory officials properly tested, screened, examined, evaluated and trained Arevalos, he never would have been hired as a police officer.

10.     Upon information and belief, SDPD's supervisory officials and the City had knowledge of the following as of September 2009:

a.     In the 1999, when Arevalos was working general patrol in the SDPD's South Bay Division, he took into custody a nude and mentally deranged young woman as a Health & Welfare Code § 5150 detainee and then taunted and encouraged the woman to sexually penetrate herself vaginally with his department-issued baton/night stick while he watched and took Polaroid photographs of her doing this;

b.     A complaint by a woman that, during a traffic stop of her by Arevalos in April or May 2001, that Arevalos, during an unlawful search of the woman, groped the woman's breast and sexually assaulted her;

c.    Around July 2007, Arevalos pulled over a 16-year old female driver during a routine traffic stop and forced her to bend over outside of her vehicle to show him her current registration tabs on the license plate — all for the purpose of Arevalos "checking out" or ogling the young woman's butt;

d.    That Arevalos, after being assigned to the SDPD traffic division and its special driving under the influence, or "DUI" enforcement unit, regularly and unnecessarily targeted for investigation and arrest for DUI primarily young women under 35 years of age to the extent that other police officers derisively referred to Arevalos as the "Las Colinas Transport Unit;"

e.    Arevalos routinely had large amounts of unaccounted for or "missing" time during his shifts, in particular, during stops of female motorists, that were never adequately explained in his written reports or shift diaries;

f.    Arevalos, using the camera on his cellular phone, surreptitiously took photographs of young women in the Gaslamp Quarter in downtown San Diego and forwarded the photographs to other police officers, including to his supervisor, Sergeant Kevin Friedman;

g.    Among the photographs Arevalos took and shared with fellow police officers and supervisors were photographs of him being orally copulated and engaging in sexual intercourse in uniform all in the back of a SDPD patrol car, some of which he kept in an album at the police station;

h.    Arevalos bragged when showing these photographs to other police officers and his supervisors that he was the uniformed officer in the photographs;

i.    In September 2009, rather than arresting a woman Arevalos had detained for driving while under the influence or DUI, he solicited a bribe of a sexual favor from her in return for releasing her, a felony under Penal Code § 68, and then sexually assaulted her anyway; and

j.    Other information about citizens' or other police officers' complaints about Arevalos' misconduct, conduct unbecoming a police officer or

1  conduct that violated SDPD procedures or standard police procedures for handling

2  traffic stops or performing physical searches of suspects, in particular, women.

3      11.   The 1999 incident with Arevalos and the mentally deranged woman

4  described in paragraph 10.a. above was interrupted by another police officer who

5  reported the incident. Arevalos physically threatened the officer warning him to never

6  again interrupt him.  Nevertheless, the police officer, who is now retired, reported the

7  incident to his and Arevalos' supervisors, Sergeant Danny Hollister and Sergeant (now

8  Lieutenant, and head of the powerful SDPD Criminal Intelligence Unit) Rudy Tai.

9  Tai passed the information on to his supervisor, Lieutenant Jorge Guevara.  Neither

10  Hollister, Tai nor Guevara did anything to report the incident involving Arevalos and

11  the deranged young woman up the SDPD chain of command, or to other SDPD

12  supervisory officials charged with investigating officer misconduct.  Rather, along

13  with Arevalos, they destroyed the Polaroid photographs taken by Arevalos and other

14  evidence of the incident.  Tai also gave Arevalos a verbal reprimand, something Tai

15  knew would not appear on Arevalos' personnel record and could mislead police

16  officials that Arevalos had never been involved in suspected misconduct toward

17  citizens.  In addition, Guevara, Tai and Hollister, with the support of other police

18  officers and other SDPD supervisory officials, carried out a campaign of abuse,

19  intimidation and harassment against the police officer who reported the incident to

20  punish him for making the complaint against a fellow officer, Arevalos. This included

21  initiating improper conduct with that police officer's minor daughter.

22      12.   This 1999 cover up of Arevalos' criminal misconduct and cover up of

23  later misconduct by him and other officers was done as part of a long-standing

24  unwritten SDPD policy that encouraged a two-tiered system of justice — one a system

25  of unwritten privileges and immunities that applied to SDPD police officers and other

26  members of the "law enforcement community" and another system of codified laws

27  and regulations that applied to the ordinary citizens.  This SDPD "unwritten policy"

28  included not ticketing SDPD police officers stopped for Vehicle Code violations,

1  including DUI, and also "fixing tickets" for SDPD police officers, as well as other law

2  enforcement officers and officials. This "unwritten policy" also manifested itself with

3  SDPD police officers and SDPD supervisory officials discouraging fellow police

4  officers from reporting instances of suspected police officer misconduct to their

5  supervisors, or SDPD Internal Affairs ("IA") the division of the department charged

6  with investigating police officer misconduct.  The policy further included SDPD

7  police officers and supervisory officials covering up reports of officer misconduct.

8  This policy has continued through the present time.

9      13.    The April or May 2001 incident described in paragraph 10.b. above was

10  reported by the victim to Arevalos' supervisors at SDPD, as well as to other SDPD

11  supervisory officials.  The then SDPD police chief, David Bejarano, learned of the

12  report and the incident.  He met with the victim twice and she described to him the

13  details of the traffic stop and sexual assault by Arevalos.  Chief Bejarano told the

14  victim Arevalos had already been properly disciplined and would never again be

15  allowed to do what he did to her or any other citizen.   This was a complete

16  misrepresentation as Arevalos was never punished or disciplined for that 2001

17  incident.

18      14.    The minor involved in the July 2007 traffic stop descried in paragraph

19  10.c., her father and a family friend who was a SDPD sergeant reported the incident

20  to Arevalos' supervisors, Sergeant Matt Verduzco and Lieutenant Victoria Binkerd.

21  The documentation on the report was destroyed, the matter was not investigated and

22  the family friend was rebuked by fellow officers and SDPD supervisory officials for

23  "siding with a civilian" against a fellow officer, Arevalos.

24      15.    The victim of the September 2009 incident described in paragraph 10.i.

25  reported the incident to an SDPD detective who, because of the "unwritten policy"

26  described in paragraph 12, failed to report the incident to his superiors or other SDPD

27  supervisory officials to IA.

28      16.    SDPD supervisory officials and the City also had knowledge of a

February 2010 complaint by a woman who was arrested for DUI by Arevalos in January 2010. She notified SDPD that Arevalos had either assaulted or sexually assaulted her in the back seat of his police car while he was transporting her to the Las Colinas Women's Facility. SDPD supervisory officials and the City believed this was a crime committed by Arevalos and recommended prosecuting him for these crimes to the Office of the District Attorney, San Diego County. However, SDPD supervisory officials, along with Sergeant Friedman, Arevalos' supervisor, and other police officers, impaired the effective exercise of prosecutorial discretion to prosecute Arevalos by falsely impugning the victim's credibility and otherwise attempting to unfairly influence members of the District Attorney's office to not prosecute Arevalos. After the District Attorney declined to prosecute Arevalos, SDPD supervisory officials, in particular, Assistant Chief Robert Kanaski, returned Arevalos to his previous duties with the traffic division without imposing any reasonable disciplinary actions upon him.

17. From 2003 to the present, SDPD, its supervisory officials and the City instituted a procedure for investigating citizens' complaints of police officer misconduct that was inadequate and designed to not impartially investigate such complaints. Such policy or policies relegated citizens' complaints to the SDPD of officer misconduct to second-class status where such complaints were either not investigated at all, or received less than an impartial investigation by SDPD and its supervisory officials.

18. The City, the SDPD and its supervisory officials had policies that have continued through to the present of:

a. Failing and refusing to establish or enforce administrative procedures and training to ensure safety of detainees or arrestees;

b. Failing and refusing to adequately discipline police officers, like Arevalos and others, for acts of abuse and misconduct, conduct that violated SDPD department procedures or conduct unbecoming a police officer;

c.    Failing and refusing to impartially investigate citizen's complaints of alleged abuse or misconduct by police officers;

d.    Reprimanded, threatened, intimidated and demoted police officers who reported acts of misconduct or abuse by other officers;

e.    Covering up acts of police officer misconduct or sanctioned a code of silence by police officers commonly referred to as the "Blue Wall," which resulted in complaints of police officer misconduct not being investigated or not being adequately and impartially investigated;

f.    Failing and refusing to adequately supervise the actions of police officers under their control and guidance;

g.    Intentionally mischaracterizing and improperly identifying complaints against Arevalos and other police officers of suspected police misconduct against citizens as low-level "Public Service Inquiries" in an attempt to dissuade victims of suspected misconduct, other police officers and witnesses from telling their stories of suspected officer misconduct and, also, to avoid having to report such complaints to the Citizen's Review Board On Police Misconduct, IA or the City's Mayor's office, or others, and through this, to prevent complete, objective and factual investigations of such complaints and avoid possible bad publicity in the media about the SDPD and its police officers, in particular, the chief of police, and the SDPD upper chain of command;

i.    Allowing the "unwritten policy" described in paragraph 12 to exist; and

j.    Failing to have in place a specific written department policy that mandated all police officers who either witnessed, or who received verbal reports of on-the-job police officer misconduct to report such alleged misconduct to SDPD supervisory officials, including, but not limited to, IA.

19.    In addition and upon information and belief, SDPD, its supervisory officials and the City knowingly sanctioned or allowed a pattern of conduct by male

1   police officers, including traffic division officers, that consisted of patrolling the

2   Gaslamp Quarter Downtown San Diego, and certain beach community areas, that

3   consisted of a party-type atmosphere where male police officers, including

4   supervisors, such as, for example, Sergeant Friedman, were attempting to get dates

5   with or pick up women while on duty.

6        20.    SDPD, its supervisory officials and the City from at least 1999 to the

7   present:

8             a.    Knowingly, with gross negligence and with deliberate indifference

9   of the constitutional rights of citizens, maintained and permitted an official policy and

10   custom of permitting the occurrence of the types of wrongs alleged in this complaint;

11             b.    Maintained, fostered, condoned or else failed to correct wrongful

12   conduct and, through this, created an official policy practice or custom of permitting

13   the occurrence of the types of wrongs alleged in this complaint;

14             c.    Maintained, fostered or condoned policies and customs, including

15   but not limited to, deliberate indifferent training of its police officers about what

16   constituted unreasonable searches or seizures of citizens;

17             d.    Maintained, fostered or condoned policies and customs that

18   included the express and/or tacit encouragement to its police officers to ignore

19   unlawful conduct and/or to ratify police misconduct by officers failing to intercede

20   when unlawful conduct was underway and/or by making material omissions in police

21   reports to prevent detection of unlawful conduct; and

22             e.    Maintained, fostered, condoned or failed to conduct adequate

23   investigations of police misconduct to prevent future misconduct from occurring.

24        21.    In or around 2003, the SDPD chief, then William Landsdowne, other

25   SDPD supervisory officials and the City disbanded the SDPD's 20-year old anti-

26   corruption unit, the "Professional Standards Unit," or PSU.  The PSU had, as its

27   official charge, the responsibility of actively and aggressively investigating,

28   uncovering and prosecuting police misconduct, including misconduct that was subject

to complaints by members of the public allegedly victimized by police officers charged with protecting and serving citizens of San Diego. The elimination of the PSU, this specialized unit, was a signal and affirmation to the SDPD, its police officers and its supervisory officials that those police officers who chose to exploit their positions of power, authority and trust by victimizing members of the very community they had sworn to protect would not be investigated, prosecuted, pursued or punished for their actions. The message was that such suspected victimization and police misconduct would be tolerated, protected, covered up and/or ignored. In addition, Chief Landsdowne instituted a process, manner and method by which complaints against police officers were handled that significantly altered and, in fact, prevented members of the public from lodging complaints against police officers directly with the IA. Chief Landsdowne instituted a policy that denied the public access to IA and required citizens to lodge complaints of suspected police officer misconduct with low-level desk officers at local stations who were not trained to handle such citizen complaints. This policy change was motivated by the SDPD, the City and the SDPD supervisory officials' desire to deter, avoid and prevent full reporting and investigation of officer-related misconduct through intimidation, harassment, embarrassment, frustration and obstruction of the public means of seeking redress for such police officer related misconduct, in reality, the "unwritten policy" described in paragraph 12.

22. The SDPD police officer, Hays, who committed the wrongful acts against plaintiffs Davis, Johnson, Ariza and others, as alleged in this complaint, attended the police academy in 2009 and 2010 and was hired as a police officer with the SDPD and the City in late 2009 or early 2010. He was then aged 26 and was the son-in-law of then SDPD Captain and now Assistant Chief, Mark Jones, a veteran officer of some 30 years, who now heads SDPD's Special Operations Unit

23. The SDPD training sergeant at the academy when Hays attended it was one Sandra Rapalee (who is now a Lieutenant and head of the SDPD Training Unit).

1    Hays' field training officer, Mark Lopez, recommended to Rapalee and other SDPD
2    supervisory officials at the academy that Hays' performance at the academy was well-
3    below average, he was unfit to be a SDPD  police officer and he should be "washed
4    out" and not hired as a police officer.  On information and belief, Jones, who in 2009
5    and 2010 was not assigned to the academy or involved with police officer candidates'
6    training or evaluations, violated SDPD policy and wrongfully interfered with and
7    influenced the potential decision by Rapalee, or other training officers at the academy
8    to wash his son-in-law, Hays, out.  On information and belief, Jones interceded with
9    Rapalee asking her to return a favor he did for her and not wash Hays out of the
10   academy.    On  information  and  belief,  Rapalee  did  this  and  rejected  the
11   recommendation of Hays' training officer, Lopez, to wash Hays out of the academy.
12   As a result, Hays, who was unfit to be a police officer and should not have been hired
13   as a police officer was hired as an officer by SDPD.

14        24.    The City, SDPD and SDPD supervisory officials, failed to properly test,
15   screen, examine, evaluate or train Hays before hiring him as a police officer.  As a
16   result, the City, SDPD and SDPD supervisory officials failed to properly identify
17   Hays as a person who was unfit to be a police officer.  Had the City, SDPD and SDPD
18   supervisory officials properly tested, screened, examined, evaluated and trained Hays,
19   he would never have been hired as a police officer.

20        25.    In March 2011, after a report by one Jane Doe to the SDPD and the City
21   that Arevalos had sexually assaulted her during a DUI traffic stop on March 9, 2011,
22   Arevalos was fired from his job as a police officer and charged by the District
23   Attorney with crimes committed against the Jane Doe and various other victims,
24   ***People of the State of California v. Anthony Arevalos***, San Diego Superior Court
25   Case No. SCD233024.  On November 17, 2011, Arevalos was convicted of the
26   following crimes:

27            a.    Jane Doe, sexual battery, Penal Code § 243.4(a), soliciting a bribe,
28   Penal Code § 68, assault and battery, Penal Code § 149 and misdemeanor false

1  imprisonment, Penal Code §§ 236, 237(a);

2        b.    Jeannie E., soliciting a bribe, Penal Code § 68, misdemeanor false

3  imprisonment, Penal Code §§ 236, 237(a);

4        c.    Melissa Wilde, soliciting a bribe, Penal Code § 68, assault and

5  battery, Penal Code § 149 and misdemeanor false imprisonment, Penal Code §§ 236,

6  237(a);

7        d.    Melissa Marin., soliciting a bribe, Penal Code § 68, misdemeanor

8  false imprisonment, Penal Code §§ 236, 237(a); and

9        e.    Melissa R., soliciting a bribe, Penal Code § 68.

10      26.    The SDPD's and District Attorney's investigation of Arevalos instigated

11  by the Jane Doe incident revealed numerous other incidents of criminal misconduct

12  by Arevalos consisting of false imprisonment, false arrest, assault and battery, sexual

13  assault and battery and soliciting bribes from young women he allegedly pulled over

14  for Vehicle Code/traffic violations between 2009 and March 2011.  The additional

15  victims included Mary Bracewell, Dani Fisher, Talia Tortora, Lacy White, Marjan

16  Montazemi and Emma M., as well as at least five other victims.

17      27.    In 2011, then SDPD Chief, Landsdowne, promised the public that the

18  City, SDPD and SDPD supervisory officials would review and revise all policies for

19  identifying, reporting, documenting and investigating police officer misconduct, either

20  misconduct reported by a citizen, or witnessed by other police officers, as well as

21  review and revise the procedures for disciplining police officers proved to have

22  engaged in misconduct. The City, SDPD and SDPD supervisory officials failed to do

23  this and, instead, allowed the situation and circumstances described in paragraphs 10

24  through 21 to continued unchanged and unabated.

25      28.    In 2011, then Chief Landsdowne also promised the public that the City,

26  SDPD and SDPD supervisory officials would do a top to bottom investigation and

27  review and institute the necessary changes in departmental policies so that SDPD

28  police officers, as well their supervisors, were properly trained and supervised to

1   insure that incidents of suspected police misconduct were identified, reported,

2   documented and investigated. This promise of creating and implementing new SDPD

3   policies, rules and procedures to create a "standard of excellence" were not done by

4   the City, SDPD and SDPD supervisory officials.   Again, the situation and

5   circumstances described in paragraphs 10 through 21 were allowed to continue

6   unchanged.

7          29.   Landsdowne also promised the public in 2011 that the City, SDPD and

8   SDPD supervisory officials would institute a written department-wide policy and

9   procedure that mandated all police officers who either witnessed or who received

10   verbal reports by the public of suspected police officer misconduct to report the

11   alleged misconduct to SDPD supervisory officials or to IA. The City, SDPD and

12   SDPD supervisory officials failed to institute such a policy until April 29, 2014.

13          30.   In 2011, then Chief Landsdowne also promised the public that the City,

14   SDPD and SDPD supervisory officials would investigate the earlier reports and

15   incidents of Arevalos' misconduct, as alleged in paragraphs 10 and 16, to determine

16   if other police officers were involved in the misconduct, or if police officers and

17   SDPD supervisory officials had handled the incidents and complaints properly.

18   Despite this promise, the City, SDPD and SDPD supervisory officials never ordered

19   or conducted any such investigation.

20          31.   As a result of the facts alleged in paragraphs 10 through 30, misconduct

21   against citizens by police officers, like Hays, as alleged below, was allowed to and did

22   continue.

23          32.   Hays, as it turned out, was more of a sexual predator, who abused his

24   power and authority as a SDPD police officer to either illegally and forcibly solicit

25   and/or to obtain sexual favors from women he dealt with during the course of

26   performing his duties as a police officer, than Arevalos.  The City, SDPD and its

27   supervisory officials learned in January or February 2014 about the following

28   suspected criminal misconduct by Hays while he was performing his duties as a police

officer on these eight victims and possibly others:

a.   Davis, false imprisonment, sexual assault and battery, indecent exposure, forcible oral copulation, soliciting a bribe, early October, 2012;

b.   Johnson, false imprisonment, approximately August 9, 2012;

c.   Ariza, sexual assault and battery, indecent exposure, false imprisonment, June 12, 2013;

d.   Jakema R., false imprisonment, sexual assault and battery, October 30, 2013;

e.   Melanie W., false imprisonment, sexual assault and battery, December 23, 2013;

f.   Amber P., false imprisonment, sexual assault and battery, December 23, 2013;

h.   Jane Doe 4, false imprisonment, December 24, 2013; and

g.   Jane Doe 7, false imprisonment, sexual assault and battery, October 2013.

33.   On February 9, 2014, the SDPD arrested Hays charging him with felonies and misdemeanors involving his alleged crimes committed against Jakema R., Melanie W., Amber P. and Jane Doe 4.  On February 18, 2014, the District Attorney filed a criminal complaint against Hays, ***People v. Hays***, San Diego Superior Court Criminal Case No. SCD253998, charging Hays with felonies and misdemeanors for alleged crimes committed against Jakema R., Melanie W., Amber P. and Jane Doe 4.  Hays resigned as a police officer from SDPD and the City on February 19, 2014.  On August 22, 2014, Hays plead guilty to one count of false imprisonment and two misdemeanor counts of assault under color of authority; other charges against Hays were dismissed.

**FIRST CAUSE OF ACTION**
**(Violation Of Civil Rights, 42 U.S.C. § 1983, By Plaintiff Michelle Davis**
**Against Defendants City of San Diego, Christopher R. Hays)**

34.   Davis realleges paragraphs 1 through 33.

35.     In early October 2013, on a Friday or weekend night around 1:00 to 2:00 a.m., Davis was a passenger in her cousin Frederick Sparrow's car. They had been with friends at a sports bar and Davis had been drinking alcoholic beverages. Sparrow was driving west on El Cajon Boulevard near the 7200-7300 block to take Davis to her home that was several blocks south at 4650 Harbinson Avenue, La Mesa. The car stalled out in the middle of El Cajon Boulevard near the center median. Sparrow left Davis in the passenger seat of the car and walked in the direction of 70th Street to get help.

36.     Shortly after the car stalled, Hays, who was in uniform, on duty and on patrol in an SDPD police cruiser at the time, arrived on the scene and parked his vehicle behind Sparrow's car. He approached Davis, who was still sitting in the car, and asked her what happened. She told him the car had stalled and Sparrow had left to get help. Hays asked her if she had been drinking and if she had been driving, not necessarily in that order. She told him she had been drinking, but had not been driving. They waited about 10 to 15 minutes for Sparrow to return. When he did not, Hays told Davis he would have to call a tow truck and have the car towed because it was a traffic hazard. He did call the tow truck and after it had arrived and left with Sparrows' car, Hays offered to drive Davis to her home on Harbinson Avenue. She agreed.

37.     Hays then drove Davis to her home on Harbinson Avenue in the SDPD police cruiser. Davis was sitting in the front seat with him. When they arrived at Davis' home, he parked the car and told Davis before she got out that he could still arrest her and take her to jail for DUI because, he said, "You were probably driving," but if you "go down on me" I will let you out. Davis was in fear of being arrested and jailed, or of Hays doing something to injure her, so she agreed and then orally copulated him to completion in the front seat of his patrol car. Davis then got out of the car and went inside her home.

38.     Davis has constitutional interests and rights under the Fourth and

1  Fourteenth Amendments to the U.S. Constitution and similar provisions of the

2  California Constitution to be free from an unreasonable seizure or detention of her

3  person, sexual harassment or violation of her person during such detention and arrest,

4  as well as the right to not have her body violated by a law enforcement officer.

5       39.    Through the conduct of the City and Hays, Davis was deprived of rights,

6  privileges and immunities secured to her by the Fourth and Fourteenth Amendments

7  of the Constitution of the United States, and similar provisions of the California

8  Constitution by her unreasonable seizure and detention, and unlawful intrusion into

9  and violation of her body and by such defendants engaging in conduct that abused

10  their power and authority as a police officer to the extent that shocks the conscience.

11      40.    Davis was harmed by the City and Hays' conduct that was a substantial

12  factor that caused her to suffer severe emotional distress, shame, humiliation, fear,

13  shock, extreme nervousness, disgust, as well as physical injury, that has damaged her

14  in an amount that exceeds $25,000.

15      41.    Hays acted with malice or oppression as defined in California Civil Code

16  § 3294, which entitles Davis to recover punitive damages against Hays.

17      42.    Davis has incurred and will incur attorneys' fees in prosecuting this claim

18  against the City and Hays, which fees are recoverable from such defendants under 42

19  U.S.C. § 1988.

20                        **SECOND CAUSE OF ACTION**
   **(Violation Of Civil Rights, 42 U.S.C. § 1983, By Plaintiff Claudia Ariza**
21       **Against Defendants City of San Diego, Christopher R. Hays)**

22      43.    Ariza realleges paragraphs 1 through 33.

23      44.    On June 12, 2013, Ariza was residing at 3735 College Avenue, San

24  Diego, with one Daniel Gerken.  On that date in the late morning, she called 911 for

25  the SDPD to respond and protect her from domestic violence by Gerken.  One of the

26  on-duty, uniformed SDPD officers who responded to this call was Hays.  The police

27  officers discovered Gerken hiding on the roof of the residence and arrested him.

28      45.    After the arrest and the other SDPD officers had left with Gerken, Hays

1  remained behind inside Ariza's residence.  He cornered her in a room in the house,

2  stared at her breasts, smiled at her and then approached and physically hugged her

3  tightly pulling her breasts hard against him.  Hays then backed away, unzipped his

4  pants and pulled out his then erect penis and testicles and masturbated in front of

5  Ariza.

6      46.    Ariza had noticed Hays' wedding ring and asked if he was married and

7  asked how he could do such a thing to his wife.  Hays became enraged, put his penis

8  and testicles back in his pants and began to leave.  Ariza asked if he would be coming

9  back and he angrily said yes.

10     47.    Over the next weeks and on at least two occasions through August 2013,

11  an SDPD police car drove by Ariza's house and shined a search light at the house as

12  the car drove past.

13     48.    Ariza has constitutional interests and rights under the Fourth and

14  Fourteenth Amendments to the U.S. Constitution and similar provisions of the

15  California Constitution to be free from an unreasonable seizure or detention of her

16  person, sexual harassment or violation of her person during such detention and arrest,

17  as well as the right to not have her body violated by a law enforcement officer.

18     49.    Through the conduct of the City and Hays, Ariza was deprived of rights,

19  privileges and immunities secured to her by the Fourth and Fourteenth Amendments

20  of the Constitution of the United States, and similar provisions of the California

21  Constitution by her unreasonable seizure and detention, and unlawful intrusion into

22  and violation of her body and by such defendants engaging in conduct that abused

23  their power and authority as a police officer to the extent that shocks the conscience.

24     50.    Ariza was harmed by the City and Hays' conduct that was a substantial

25  factor that caused her to suffer severe emotional distress, anxiety, panic attacks,

26  depression, shame, humiliation, fear, shock, extreme nervousness, disgust, as well as

27  physical injury, that has damaged her in an amount that exceeds $25,000.  Ariza has

28  also incurred expenses from healthcare providers for treatment for such physical and

1    psychological injuries.

2        51.    Hays acted with malice or oppression as defined in California Civil Code

3    § 3294, which entitles Ariza to recover punitive damages against Hays.

4        52.    Ariza has incurred and will incur attorneys' fees in prosecuting this claim

5    against the City and Hays, which fees are recoverable from such defendants under 42

6    U.S.C. § 1988.

7                    **THIRD CAUSE OF ACTION**
     **(Violation Of Civil Rights, 42 U.S.C. § 1983, By Plaintiff Nicole Johnson**
8        **Against Defendants City of San Diego, Christopher R. Hays)**

9        53.    Johnson realleges paragraphs 1 through 33.

10       54.    Around August 9, 2012 at about 11:00 a.m., Johnson was driving her car

11   on 58th Street south of El Cajon Boulevard, San Diego.  Hays was on duty as an SDPD

12   police officer, in uniform and patrolling this area in his police cruiser.  Using the

13   lights on the police cruiser, Hays stopped Johnson for an equipment infraction on her

14   car — driving with a malfunctioning rear brake light.  During the approximate 20 to

15   25 minute traffic stop, Hays engaged in a personal conversation with Johnson and

16   asked her unnecessary and unwanted personal questions, was she married, was her

17   husband home and did she have children.  He then told Johnson to get out of her car

18   because there was a warrant for her arrest.  Johnson refused.  She told Hays there could

19   not possibly be a warrant for her arrest and that she would not get out of her car until

20   he explained to her what the warrant was for.  He never did.  Instead, Hays told her he

21   was just joking and was only trying to get her out of the car.  Johnson told him to

22   either give her a ticket, or let her go.  Hays continued with the unnecessary and

23   unwanted personal conversation with Johnson, telling her things that were unrelated

24   to the traffic stop, that he was getting divorced or was separated from his wife, he was

25   lonely and he would come to her house and fix the taillight if her husband was not

26   home. Hays also asked to go out to dinner with him. Johnson said no and again asked

27   him to either ticket her or let her go.  He let her go, but followed her for some time

28   after she drove away.

55.   Johnson has constitutional interests and rights under the Fourth and Fourteenth Amendments to the U.S. Constitution and provisions of the California Constitution to be free from an unreasonable seizure or detention of their person and sexual harassment during such detention and potential arrest.

56.   Through the conduct of the City and Hays, Johnson was deprived of rights, privileges and immunities secured to her by the Fourth and Fourteenth Amendments to the U.S. Constitution and provisions of the California Constitution by her unreasonable seizure and detention and engaging in conduct that abused Hays' power and authority as a police officer to the extent that it shocks the conscience.

57.   As a legal result of the acts of the City and Hays, Johnson sustained severe emotional distress consisting of fear, humiliation, shock and extreme nervousness that has damaged her in an amount that exceeds $25,000.

58.   Hays acted with malice or oppression as defined in California Civil Code § 3294, which entitles Johnson to recover punitive damages against him.

59.   Johnson has incurred and will incur attorneys' fees prosecuting this claim against the City and Hays, which fees are recoverable from such defendants under 42 U.S.C. § 1988.

**FOURTH CAUSE OF ACTION**
**(Violation Of Civil Rights, 42 U.S.C. § 3789d, By All Plaintiffs**
**Against Defendant City of San Diego)**

60.   Plaintiffs reallege paragraphs 1 through 59.

61.   The City and SDPD have been the recipients of assistance and funding from the federal government under the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3799d.

62.   The City, SDPD and SDPD supervisory officials by engaging in the discriminatory acts in connection with programs and/or activities funded in whole or in part with funds provided to the City and SDPD under 42 U.S.C. § 3789d, as alleged in this complaint, violated and are in violation of the specific provisions of 42 U.S.C. § 3789d, that prohibits such discrimination.  Plaintiffs, therefore, request a finding

1   under 42 U.S.C. § 3789d(e)(2)(A) that the City and SDPD has engaged in a pattern

2   or practice of discrimination that has violated 42 U.S.C. § 3789d(e)(1).

### JURY DEMAND

4       63.   Plaintiffs demand a jury trial.

### REQUEST FOR RELIEF

6       Therefore, plaintiffs Michelle Davis, Nicole Johnson and Claudia Ariza request

7   a judgment against defendants City of San Diego and Christopher R. Hays for:

8       a.   General damages according to proof;

9       b.   Special damages according to proof;

10      c.   Punitive damages against Hays;

11      d.   A finding that the City has engaged in a pattern or practice of

12   discrimination that violates 42 U.S.C. § 3789d(e)(1);

13      e.   Reasonable attorneys' fees under 42 U.S.C. § 1988e;

14      f.   Costs of suit; and

15      g.   Any other proper relief.

17   Date: September 15, 2014          The Gilleon Law Firm

18                                     ___/s/___ James C. Mitchell___
19                                     James C. Mitchell, Attorneys for
                                       Plaintiffs Michelle Davis, Nicole Johnson
20                                     and Claudia Ariza